NOTICE: NOT FOR OFFICIAL PUBLICATION.
UNDER ARIZONA RULE OF THE SUPREME COURT 111(c), THIS DECISION IS NOT PRECEDENTIAL
AND MAY BE CITED ONLY AS AUTHORIZED BY RULE.

IN THE

# ARIZONA COURT OF APPEALS
## DIVISION ONE

IN RE TERMINATION OF PARENTAL RIGHTS AS TO G.D.

No. 1 CA-JV 23-0079
FILED 10-3-2023

Appeal from the Superior Court in Maricopa County
No. JD527909
The Honorable Julie Ann Mata, Judge

**AFFIRMED**

COUNSEL

Maricopa County Public Advocate, Mesa
By Suzanne W. Sanchez
*Counsel for Appellant*

Arizona Attorney General's Office, Phoenix
By Emily M. Stokes
*Counsel for Appellee Department of Child Safety*

Maricopa County Public Advocate, Phoenix
By Katherine Badrick
*Counsel for Appellee G.D.*

_____

**MEMORANDUM DECISION**

Judge Michael S. Catlett delivered the decision of the Court, in which Presiding Judge David D. Weinzweig and Judge Maria Elena Cruz joined.

_____

**C A T L E T T**, Judge:

¶1         Julianne W. ("Mother") appeals the termination of her parental rights to G.D. ("Child").  Mother argues that the Department of Child Safety ("DCS") failed to diligently provide reunification services.  We affirm.

**FACTS AND PROCEDURAL BACKGROUND**

¶2         Mother gave birth to Child in 2019.  Two years later, DCS received a report alleging Mother and Child's father exposed Child to domestic violence, including physical fighting involving or around Child.  DCS removed Child from the home, placed Child with a foster family, and filed a petition alleging Mother was unwilling and unable to provide proper and effective parental care.  The juvenile court determined Child was dependent and prepared a family reunification plan.

¶3         Shortly thereafter, DCS referred Child to a behavioral-health provider.    The    provider    observed    that    Child    struggled    with communication, knowing only two or three words, was aggressive toward other children, and had trouble with speech in general.  Child also lacked appropriate sleep—possibly rooted in trauma from often awaking to his parents fighting.

¶4         DCS continued to implement services to better Child's environment and behavior and reunify the family.  These services included substance abuse treatment, drug testing, a psychiatric evaluation, domestic-violence treatment, a parenting-education program, and supervised visitation.  DCS noted in May 2022 that Mother was "resistant to [DCS]'s intervention," rejected consistent drug testing, was erratic and hostile, and lacked overall engagement as to many of the services provided.  Mother tested positive for THC and methamphetamine in 2021 and had not tested since, despite multiple requests from DCS.

¶5         DCS provided case management services to the family.  The case manager met with Mother, sent a service letter, helped with domestic

violence direct referrals, and followed up monthly. DCS offered domestic violence counseling, but Mother did not engage. DCS held team decision-making meetings, involving all stakeholders, to identify impediments and issues and develop a service plan to remedy them. Mother attended the initial meeting but none thereafter. Lastly, a psychological consultation was recommended, requiring a period of sobriety. The consultation was not conducted because Mother failed to demonstrate such sobriety. To help alleviate barriers to attending services, DCS offered transportation services to Mother upon request.

¶6            DCS provided supervised visitation. Mother regularly visited Child, despite often "arriving under the influence and acting erratic, paranoid, and aggressive." Sometimes she would not appear at all. Once, she threatened to break the kneecaps of a case aide. Other times, Mother played roughly with Child and had to be redirected from doing so. She also provided him with junk food during visits. These interactions led Child to return to his foster home dysregulated.

¶7            Child's post-visit dysregulation increased around June 2022. For example, he was abusive with animals around the foster home. Child also inflicted harm on himself and threw tantrums. After visits with Mother, Child had heightened emotions—he threw small furniture and food, kicked items until they broke, and aggressively pushed other children. Before a visit with Mother in late 2022, Child expressed to DCS that he did not want to see Mother and that "mommy scares [him]." When DSC told Child he did not have to visit Mother, his behavior improved significantly.

¶8            Because of Child's behavior, DCS consulted a psychologist, who concluded that there was significant concern of further emotional harm to Child if visits with Mother continued. The psychologist "recommended that visits [be] temporarily paused while [Mother] engage[s] in individual services to prepare for re-initiating visits" and until she demonstrated sobriety to the extent that she could continue substance abuse treatment and renew visits.

¶9            With this recommendation, DCS moved in January 2023 to suspend visitation. After reviewing the motion and supporting materials, the juvenile court suspended visitation until such time as "DCS [could] implement clinically supervised parenting time . . . left to the discretion of DCS." The court stated that the issue of visitation would be revisited the following month at the termination trial.

**¶10** The juvenile court held a termination trial on February 14. During the trial, the court concluded that, "given the evidence and the testimony that's been presented today, the court is going to deny the motion to reconsider [the court's decision to suspend visitation]."

**¶11** The juvenile court subsequently terminated Mother's parental rights on two grounds—substance abuse and out-of-home placement. The court determined that DCS had made diligent efforts in providing reunification services and reunification would have been likely had Mother completed those programs. The court found that it was in Child's best interest to terminate Mother's parental rights because Child "would have permanency in a substance abuse, domestic violence free home."

**¶12** Mother timely appealed. We have jurisdiction. *See* A.R.S. § 8-235(A).

## DISCUSSION

**¶13** Mother appeals termination of her parental rights, arguing DCS failed to provide sufficient reunification services. Mother argues the juvenile court unlawfully suspended parent-child visitation, thereby impacting reunification. We "will affirm a severance order unless it is clearly erroneous." *Alma S. v. Dep't of Child Safety*, 245 Ariz. 146, 151 ¶ 18 (2018). We view the evidence in the light most favorable to sustaining the juvenile court's ruling and will not disturb a factual finding unless there is no reasonable evidence to support it. *Adrian E. v. Dep't of Child Safety*, 239 Ariz. 240, 241 ¶ 2 (App. 2016); *Mary Lou C. v. Ariz. Dep't of Econ. Sec.*, 207 Ariz. 43, 47 ¶ 8 (App. 2004).

## I.    Challenge of Suspension Order

**¶14** Mother challenges the juvenile court's order suspending her visitation rights with Child. DCS claims that Mother cannot challenge that order because it is not a final, appealable order. Typically, an order that substantially limits a parent's ability to have any contact with their child is a final, appealable order. *See Maricopa Cnty. Juv. Action No. JD-5312*, 178 Ariz. 372, 374–75 (App. 1994). The Arizona Rules of Procedure for the Juvenile Court state, for example, that an order *terminating* visitation is appealable by an aggrieved party. Ariz. R.P. Juv. Ct. 601(b)(2)(E). But the Rules do not address a temporary suspension of visitation. *See* Ariz. R.P. Juv. Ct. 601(b).

**¶15** We need not decide whether an order suspending visitation is a final, appealable order. After a judicial severance of parental rights, as occurred here, any parental right of association is entirely terminated. *See JD-5312*, 178 Ariz. at 374–75. The issue of Mother's visitation rights, as a stand-alone issue, is therefore moot. *See* A.R.S. § 8-539 ("An order terminating the parent-child relationship shall divest the parent and the child of all legal rights, privileges, duties and obligations with respect to each other[.]"). We do, however, consider the suspension of visitation rights in the context of the live issue Mother raises on appeal—whether the juvenile court abused its discretion in concluding that DCS had provided Mother with diligent reunification services.

## II.    Diligent Reunification Services

**¶16** Mother appeals from the juvenile court's finding that DCS provided diligent reunification services. Specifically, Mother points to the juvenile court's suspension of her visitation rights with Child.

**¶17** DCS has an affirmative duty to make all reasonable efforts to preserve the family relationship by providing parents "the time and opportunity to participate in programs designed to help [them] become an effective parent." *Christina G. v. Ariz. Dep't Econ. Sec.*, 227 Ariz. 231, 235 ¶ 14 (App. 2011). Arizona law requires DCS to make diligent efforts to "preserve the family by providing all rehabilitative services reasonably necessary to rectify the conditions that led to the child's removal." *Michael M. v. Ariz. Dep't Econ. Sec.*, 202 Ariz. 198, 200 ¶ 9 (App. 2002). DCS is not required, however, to provide "every conceivable service," nor is it "required to provide services that are futile" or have no "reasonable prospect of success." *Christina G.*, 227 Ariz. at 235 ¶ 15 (internal quotation marks and citations omitted).

**¶18** Visitation is a reunification service. *Francisco F. v. Ariz. Dep't Econ. Sec.*, 228 Ariz. 379, 381 ¶ 8 (App. 2011). A parent's right to visitation should only be denied under "extraordinary circumstances"—namely, when visitation seriously endangers a child's physical, mental, moral, or emotional health. *See JD-5312*, 178 Ariz. at 375; *see also* A.R.S. § 25-411(J).

**¶19** Even if suspending visitation rights a month prior to a termination hearing could result in a finding that overall reunification services were insufficient, the juvenile court did not err in finding sufficient services here. To begin, the record demonstrates that DCS provided Mother with the time and opportunity to participate in several programs to help her become an effective parent, spanning roughly two years. These

programs included substance abuse treatment, drug testing, a psychiatric evaluation, domestic-violence treatment, and a parenting-education program. Mother, however, lacked overall engagement in the services provided. Mother does not adequately explain how suspending her visitation rights a few weeks prior to termination resulted in a failure on DCS's part when Mother persistently failed to take advantage of other services at the heart of DCS's reunification efforts, particularly those aimed at assisting her with substance abuse and domestic violence.

¶20        Moreover, the juvenile court did not abuse its discretion in suspending Mother's visitation rights. *See JD-5312*, 178 Ariz. at 375–76 (applying an abuse of discretion standard). The juvenile court's decision hinged on specific testimony that Child suffered adverse emotional and behavioral consequences after visitation with Mother. According to the psychological consultation, without suspension there was a likelihood of further emotional harm to Child. The juvenile court found, after suspension in January 2023, the Child's "concerning behaviors subsided." Sufficient evidence supported the juvenile court's endangerment finding and the resulting suspension of visitation. *See id.* (explaining that the juvenile court is in the "most favorable position to determine what is best for the [child]").

¶21        Mother also asserts that the court did not conduct an evidentiary hearing on the issue of visitation and suggests one is required upon request. Mother, however, agreed during a status conference in January 2023 that the juvenile court could address the visitation issue during the termination hearing in February 2023. The juvenile court then heard evidence about visitation during the termination trial. It was only after hearing such evidence that the juvenile court denied Mother's motion to reconsider the suspension of visitation. The court did not err in resolving the visitation issue in this manner.

## CONCLUSION

¶22        We affirm the juvenile court's judgment terminating Mother's parental rights.